You may proceed. Good morning, Your Honor. Shawna Parks for Appellant Shantanu Neravetla. I appreciate the court's time this morning and I would like to reserve three minutes for rebuttal. And I would like to be the first to admit that when we're dealing with allegations that a doctor may have mental health issues, of course, we want to make sure that all of our medical practitioners are safe. And nothing that Appellant is arguing runs contrary to either of those principles. But what we would argue is that that carefulness, it has to go both ways. And it's precisely because of the high-stakes nature of the allegations in this case that courts cannot be outcome-driven in cases like this, which is what I would argue happened at the court below. And it's precisely because of the high-stakes nature of these allegations that the substantive and the procedural protections of the law must be followed. And this case was decided on whether the plaintiff wins. The question is really just whether he gets his day in court, whether he gets to plead his case to a jury. And what the cases say under both federal law and Washington state law is that the threshold for surviving summary judgment for a plaintiff in an employment discrimination case like this are very, very low. What's a triable? Can you identify a triable issue of material fact on, say, the ADA claim and what element that goes to that would preclude summary judgment in this case? Sure. Absolutely. So there's three basic elements to the prima facie case. Under, I'm going to focus on the discrimination claim in particular. Whether the plaintiff has a disability, here he alleges that he was regarded as having a disability. And there is a wealth of information in the record related to that. For example, after the first meeting with the plaintiff, Dr. Dubois, who is one of the defendants in the case, nine days later wrote an email saying, I'm pretty certain we're dealing with a guy at a minimum who has a narcissistic personality, perhaps a substance abuse problem or worse. Not sure what could be worse, but I expect we're going to have to insist on a psyche vow for this guy. That's at 2 ER 244. That was nine days after he met the plaintiff. There are a number of other examples in the record where Dr. Dubois asserts that Dr. Nerevetla was displaying paranoia, that his behavior was bizarre. That's at 6 ER 939, 2 ER 247. And later in the case, in making the referral to the Washington Physician's Health Program, he represented that Dr. Nerevetla was cognitively impaired, that he had mental delays. What about if you're looking at establishing, you're now focusing not on the ADA claim, but on the law against discrimination claim, is that right? On both, actually. Okay, so let me, then I have a mental health issue and then I have another one. Let me first ask you about what I think was called the red flag incident. And that's where he left one of the patients up at the hospital when that patient needed care. Why wasn't that in itself sufficient to show that he wasn't doing satisfactory work in terms of the prima facie case? Well, that's a good question. And I'm sure when... Is there a dispute that the timing of that occurred, that he did leave the hospital and he left the patient? I believe that there is a dispute from Dr. Nerevetla's perspective about the particular facts of that incident. But I think what's actually more important is that that's not actually why the hospital represents that it terminated Dr. Nerevetla. And that's what's sort of interesting about the record here, is that there are a lot of assertions about performance reviews, among other things, which are countered in numerous places by countervailing evaluations of his performance by other doctors at the hospital. And also some of these incidents like the red flag incident. But what the respondents say in their papers... It may be, but as you pointed out, there are multiple elements and it does go towards whether he's qualified to perform. It calls his qualification into question when you leave a patient at risk. He may dispute exactly what happened, but there isn't a dispute that he had the pager and was supposed to respond and didn't respond because he wasn't even on the premises at the time. But let's get to the element that you raised, which is the termination based on perceived disability. Let's assume that there was a perceived disability. I thought the evidence seemed fairly clear that he was terminated because he didn't comply with the referral, which seemed pretty reasonable. There's cause for concern. The employer can take steps to determine whether he is fit for this position, especially the sensitivity of the nature of the position, as you pointed out. So what material facts counteract the employer's proffered reason that it's the refusal to really cooperate with the referral to conduct this evaluation that really caused the termination? Why is that a pretextual reason? So I think that's a good question. And I think the operative phrase in the question is if there's cause for concern. And I think this case comes down to whether the cause for concern was legitimate. And, for example, a countervailing fact in the record is Dr. Gadgil, I believe that's how you pronounce it, who supervised Dr. Nerevedla in the ICU, specifically called into question this referral when it was happening. And he said, the referral for psychiatric evaluation is hard for me to reconcile. There doesn't appear to be any evidence of demonstrated behavior that would suggest psychiatric concerns, nor was there evidence to suggest... The guy is missing in action on more than one occasion. I mean, this is not normal conduct of an employee, let alone a doctor. So it seems to me you have a legal issue that you need to address. And that is, one doctor might think, well, maybe we don't need a psychological evaluation, and another one might think we do. But the circuits that have addressed this have indicated that simply referring someone for an evaluation doesn't establish that you are regarded as disabled under the ADA. And I'm wondering if the position you're taking would require us really to occasion a circuit split if we were to go your way. Because we're not... If you can't refer someone simply because you have some concern, because it might get you an ADA claim, then you're basically in kind of a circular position as an employer. So in your view, as a matter of law, is there some problem if you refer an employee for a psychological evaluation? I think there's two points in response to that answer. One is the evidence in this case that the plaintiff was regarded as having a disability is actually not based on just the referral itself. It's based on numerous comments at the hospital prior to the referral. But then let's answer the fundamental question. So in your view, the referral itself is not a grounds for saying that there's an ADA claim? Well, for the purposes of the discrimination regarded as, it's not necessarily the basis for that. There is a separate claim related to improper referral for a medical examination. And that, I think, is not so much a dispute on the facts because I don't... I think I have to concede that the law says you can, under appropriate circumstances, refer for a medical referral. But it's still important, whatever the theory of the claim is, because, I mean, that's the reason for the termination, right? The failure to comply with the referral order, I guess you call it, right? He actually did comply. He did go to the Washington Physicians Health Program. No, but he didn't follow through with that, what he was told to do, did he? Well, but the problem is, and this goes back to, I think, the disputed evidence in the case, is that the information that the Washington Physicians Health Program was operating on was all collateral information from the hospital. And what they say is that... So for that reason, he claims he was entitled to disregard their, you know, their orders or their prescriptions or whatever you call them, right? Well, actually, he did comply with what the Washington Physicians Health Program said, and he went to Pine Grove Behavioral Health, which was what their recommendation was. Pine Grove Behavioral Health, even though... I thought he walked out of there or something like that. Well, going to the specifics of the meeting, I think there was some disagreement with him at the meeting about what he was supposed to do, but he did ultimately comply with what they said, which was to go to Pine Grove, and they did a full evaluation, which is the sealed excerpts of record in this case, which did not diagnose him with anything, but nonetheless ordered inpatient treatment. And it was on the basis of that disagreement that he did not follow through with the inpatient treatment because he'd not been diagnosed with anything. So what are you saying? He's entitled to make his own decision. Well, what they told me to do is nonsense because I'm not suffering from that disability, right? I don't have to follow through. That's my own judgment, and I'm prescribing that to myself. He can do that. Isn't that what you're saying? I would change the characterization, which is that his concern was that the process from the beginning of the referral to the Washington Physicians Health Program was tainted. By the information provided by the hospital, and for example, the Washington Physicians Health Program said that they decided what to do with him based solely on what the hospital said, and that before he even got there, they had determined that the hospital had determined he was impaired. Well, that sort of gets us to the next step, I guess, which is that before he was, what's the word? It's not discharged. Terminated from the program. He was given a hearing, wasn't he? He was. All right. So at that point, he had the chance to raise all these complaints you're voicing now, right? He did have a chance to raise these concerns. He actually at one point requested an investigation by the hospital, which was not conducted. They said they would only conduct it at such time as he came back to work. And he also sought help from Dr. Kaplan, who's the CEO of the hospital. He wrote him a lengthy letter explaining his position and his perspective on things, and did not receive a response. And I actually think going to that grievance hearing, I believe the testimony at that grievance hearing is very justified on Dr. Narabello's behalf. Nobody actually testified in opposition to him. But I mean, it's up to whoever it was, board committee, whoever it was, you know, who was conducting that, I'll call it the disciplinary proceeding to make the judgment, right? Of which one of those people, you know, were more credible. And it's not for us to second-guess those judgments, is it? Well, I think the allegation is that those judgments were based on discriminatory information and discriminatory assumptions about whether he had a disability. Then it is up to this Court to second-guess them. So in order for you to prevail, we would have to find that there was a legitimate cause for concern that triggered the referral, right? And that's how you get to the pretext is that the referral itself was not problematic, because if there's legitimate cause for concern, an employer can do that. And then if there's failure to basically follow through and cooperate, the employer can terminate based on that. So for you to win, we'd have to be convinced that there are tribal issues with regard to whether the cause for concern that's articulated by the employer was legitimate in the first place. And I think that's correct, and it brings me back to what the standard is here. And so what the Court in Ninth Circuit said in Chuang was that we're not even talking about a preponderance of the evidence standard to survive on summary judgment. It's de minimis, what he has to show. And I think if you look at the evidence in the record, his three experts who said he didn't have a disability, the doctors at the hospital who were calling into question this referral, the numerous other doctors who said, among other, you know, one doctor said he was the best resident I'd worked with this year. Another said he was the best resident I'd ever worked with. I think that's enough under Chuang and under Scrivner, which is the Washington State case, to survive on summary judgment. That's the only question here. Last minute. Thank you. Good morning, Your Honors. I'm Paula Lehman of Davis-Wright here on behalf of the respondents. And with me this morning is Michael Rice, my co-counsel at counsel table. I wanted to start by pointing out that this case, the core of this case, is really about two alleged adverse actions. And I think you've got it, you've already hit it right on the head. The first one is the referral to the Washington Physician Health Program. Was that referral lawful? The record shows that it was not only lawful, it was not discriminatory. Once you assess that decision, I think that really governs the next question, which is, was the decision to remove him from the residency program lawful, non-discriminatory? The answer to that is also yes, because once he doesn't comply with the referral, he clearly has been insubordinate. He was told in the mandatory referral that if he did not comply with it, his residency would be terminated. And that's exactly what happened here. That's so true, even though his position is that the referral and the subsequent recommendations at that, wherever he was referred to, were all based on false assumptions. It is true. So let's look at the referral. The standard for that has already been articulated, which is an employer is entitled to send an employee for an evaluation when it is job-related and business necessity. In this case, there could be nothing that's more job-related or necessary than assuring that a resident, a first-year resident just out of medical school, meets the statutory standard of being able to take care of patients with a reasonable degree of skill and safety. How does the allegation that the comments surrounding that referral, about the narcissistic personality, the substance abuse, and maybe worse, are regarded as being true? How does that figure into this statutory right to refer someone? So the statutory right comes from, it's not only a right, it's a mandatory obligation for a residency program, a hospital, or even an individual provider who has concerns that another physician may be impaired. That's a statutory standard. It's not from consistently bad performance, but from erratic performance. So you would expect to see some evaluations that are good, and you would expect to see others that are not. It was the failure to consistently perform at the level necessary to ensure safe patient care that led to the decision to refer him to WPHP. But it all rolls back into itself, based on the argument that's made by the doctor's counsel, which is that underlining the fact that a physician is not a good physician, underlying this referral is really this view that he's got a disability, and that this perception colors everything. So what does the hospital say about that? And I think, Your Honor, that you actually captured that in your questions to Dr. Nervetla's counsel, and that is, any time that you refer someone for testing, it's triggered by a concern about performance. And in this case, Dr. Dubois was concerned about his performance, and he speculated, maybe it's a health condition, maybe it's a mental condition, maybe it's something else. But those concerns are natural and part of the process of referring someone for a test, but it is not unlawful discrimination to do so. The law is clear, provided the referral is predicated on job-related business necessity, both are here, that is not unlawful discrimination. It is not regarded as discrimination. So I know you're trying, in effect, to bootstrap if it's permissible to make the referral, and therefore he then goes to the health assessment. That doesn't answer, does it, whether he has to comply? I mean, does he have to comply with anything that is recommended? How do you, or is that a factual question? So let me back up and say, what happened here is that he was given a mandatory referral to come back with an endorsement that he was fit for duty, a yes or a no. And if he didn't comply with that process, then his residency was in jeopardy. That was the direction that was given to him. Then you have to do something, you have two choices. You can send him to the Department of Licensing for disciplinary action, or you can refer him to an entity such as WPHP for assessment. That is the choice that the program made, which I would point out was the most advantageous choice for Dr. Nervetla, because it's a confidential- Because you don't start the licensing. Right, you don't start that, you simply, it's a confidential assessment. If he is deemed fit for duty, he comes back to the residency, done. So that's what they did here. But in doing that, that is not a, and I'm not trying to bootstrap, I'm really trying to understand and answer what you're asking me, that is not unlawful discrimination. It may be that Dr. Dubois, again, thought that he could have some sort of a disability or a mental issue, but the driving force for the referral is the erratic behavior. Any employer may speculate about what's causing that. For example, if he had shown up for work covered in a rash, they might have referred him for a test and thought maybe he has a contagious disease that might or might not be accurate, but that's what the law requires them to do. So once, though, the assessment is made that he's not fit to come back at that point, then in the hospital's view that it's basically in a safe harbor position? If the decision is he's not safe to come back, then the hospital's view is he can't, he is removed from the residency program, because it's a licensure issue, right? And I don't think you should lose sight of that. If he's not deemed reasonably, you know, practicing medicine with a reasonable degree of skill and safety, he isn't licensed anymore. His contract, his residency contract, which is in the record, requires a valid Washington license. The law requires to have a valid Washington license. It would be helpful to me if maybe you would try to address the plaintiff's arguments directly in terms of the elements of an ADA claim, and why none of these three elements turns on a controversial issue of fact, right? You know what the elements are, right, the three elements? And you think, right, obviously that medical centers rightly entail a summary judgment, because there's no controverted issue on any of the three factors, right? We would contend there aren't controverted issues on any of the three, but I believe we would prevail in summary judgment as appropriate if two of the three are met and one is not. He has, his prima facie case has to rest on all three things. One is a perceived disability, one is qualified, and I will get back to that in a minute, and the third is the causation case. All right, so the first is, he's either disabled or perceived as being disabled. Now, do you agree the plaintiff has at least made that showing? I would respectfully disagree that the plaintiff has established sufficient evidence to show that the program assessed him as disabled. He has, or perceived to be disabled. They did, they had concerns about his performance. Even in spite of all the comments of, you know, his direct supervisor and other people. The primary, and I believe is indeed the sole evidence of the perceived disability is the July email from Dr. Dubois to his supervisor, and there he says, he's recounting a conversation he had with the dean of the medical school. He might be narcissistic, you know, he might have substance abuse, which may or may not be a disability. We don't know the answer to that. There aren't enough facts. I mean, if he had had substance abuse problem, it could be a disability or it might not. I have no idea, for instance, whether being narcissistic qualifies as a disability under the ADA. So I think the way that Dr. Dubois testified he was using it was in the same sense the rest of us would as somebody who thinks well of himself or is self-focused. Not as a diagnosis of a psychiatric disorder. But I think it's possible that there is a disorder that is narcissism, so I think that's where Plankton's argument comes from. So your conclusion is what, he hasn't met the first element even? I don't believe that he has. I understand that that email's in the record. I'm not disputing it. But I don't believe that that's sufficient to show perceived disability. But even assuming it was, if you move to the second factor, which is qualified, there is absolutely no dispute. Dr. Nervetla does not dispute that he did not follow through with WPHP. His license has expired. He isn't able to get a license in Washington State. And that was determined by the Board of Medical Quality Assurance, MQAC, in an unanimous opinion, which is in the record. That happened when? After he was discharged from the... It happens later, but nonetheless, the determination from the licensing entity, from MQAC, that he is unable to practice medicine with reasonable skill and safety renders him not qualified as a physician in Washington State, without dispute. Still, I mean, that's a determination that was made way after these events, right? In fact, based on these events, to some extent. Actually, no. If you read the MQAC decision, the Board was very careful to not rest its decisions on the disputed evaluations from the residency program, but instead relied on the testimony of really four key people, one of whom was Dr. O'Connell, who was a counselor he had at Virginia Mason. But the others are the two individuals at WPHP who assessed him, and then the others were the physicians at Pine Grove, who also did an assessment. But when, I think you said something earlier, that when he came back from that assessment and then he refused to comply with their recommendations, at that point he wasn't qualified, because he wasn't a licensed physician. But there had been no decision at that point, correct? So let's look at the timeline, because that's really important. So he was sent to WPHP in February, he had two sessions, they did refer him out to Pine Grove where he had several options. He ceased communicating with WPHP, which is what led them in March, a month later, to report him to the licensing authority. So that part... His contract expired in July of 2012, before he was removed from the program. Remember, a resident gets a one-year license. His ran from June of 2011 until the end of July in 2012. It expired. He has a contractual obligation to have a current license and to maintain it. So his license was not renewed. Correct. So by the time he was terminated, he had no license to practice medicine. That is correct. So on the second element, your position is that it's not an uncontroverted fact that the plaintiff is a qualified individual, right? That is my position. Now what about the third, that he was terminated because of his disability, or something like that? I again go back, and I think your Honor's made the argument probably better than I did with opposing counsel, but he wasn't terminated because of the disputed performance within the program. He was terminated because he didn't comply with the instruction to go and cooperate with WPHP. It's that simple. He could have had perfect performance evaluations, and he still would have been terminated for the insubordination of not going through that process and not providing them with the requisite information they needed in order to return him to the program so that he could practice medicine. Now I'm not sure the relation, now he was in this one-year residency program, right? Yes. Now I'm not sure what the relationship is. Does that make him like a staff physician on the payroll? No. So he just graduated from medical school, he's an M.D. He's in a special program under a one-year contract as a resident, which has different licensing requirements and different expectations for how you practice medicine, particularly under his license. Is he treated as a student or as an employee, or both? Well, the cases on that are really interesting, that it's a mixed blend. In some aspects he's an employee, and in others he's a student, and it's an education program to teach him how to transition from book learning to practical learning with patients. The limited license he has only allows him to practice under direct supervision of another physician. So he's not a staff physician, he doesn't have his own staff privileges. So his termination was from being whatever it is, a student or a resident physician in that one-year residency program, right? He was terminated from that program. Interestingly enough, his contract had already lapsed. He was on a leave of absence during this period of time. So when you look at the documentation, the record, you'll see the way the program characterized it was that he was removed from a participant in the residency program, but his contract had already lapsed. And then whatever happened or was done with his license was done by the state board? Correct. Yes, Virginia Mason had no role in that, and in fact was even unaware of many of these issues until later in the fall in that time frame, because Dr. Nervetla had instructed WPHP to not communicate with his employer. Thank you. Your Honor, just a couple of points. With respect to the fact about whether Dr. Nervetla's license had expired, I think that's really a red herring. It was a temporary one-year license granted for purposes of the residency. I don't think it even came up at the grievance hearing. But what I'd really like to focus on is bringing us back to the question of... Why doesn't that go to whether he was qualified? Whether he held a license? Yes. There was no, but the timing in this case was a little bit odd. But the question is, you can't be a practicing physician without a license, right? Right. The grievance hearing was held after the expected expiration date of his license. So he was expected to be licensed from June to June, June 2011, June 2012. The grievance hearing wasn't until October 2012. So the license expired of its own accord. The medical board proceedings had not really gotten underway at that point. So it didn't come up at the grievance hearing, and it was certainly never asserted as a basis for his termination that the license had expired. But what I'd also like to bring us back to is just the question of disputed facts here. I believe this record reads like, it was the best of times, it was the worst of times. There are people who said that he was a problem. There are just as many people who said he did perfectly fine or even exceptionally. Pine Grove's report even said there was a marked inconsistency in the reports about him. That's at 5 ER 8. That was counsel's actual point. In fact, it was the erratic and inconsistent nature that was somewhat of his undoing. But I don't think inconsistency necessarily means erratic. I do believe that there was a perception developed about Dr. Naravetla early on that was sort of, as another analogy, the basis of a small snowball. And as that snowball went downhill, it accumulated more math, it picked up steam, and at some point it just became unstoppable. And I would recommend to the court to read Dr. Roberts' testimony from the grievance hearing. He's at 4 ER 694 to 705. He was a senior resident in the thoracic surgery department and I think has a very good analysis of what happened here and how it was unfair to Dr. Naravetla. Thank you. I'd like to thank you both for the arguments. The case of Naravetla v. Virginia Mason is submitted.
judges: Tashima, McKeown, Nguyen